IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CRIMINAL NO: 16-cr-00017 |
| | ) | |
| ISSA BATTLE, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) **TYPE OF PLEADING:** | |
| | ) | |
| | ) MOTION FOR COMPASSIONATE | |
| | ) RELEASE PURSUANT TO TITLE 18, | |
| | ) U.S.C. § 3582(c)(1)(A)(i) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) **FILED ON BEHALF OF:** | |
| | ) | |
| | ) ISSA BATTLE | |
| | ) | |
| | ) DEFENDANT | |
| | ) | |
| | ) | |
| | ) **ATTORNEY OF RECORD:** | |
| | ) | |
| | ) ADAM B. COGAN, ESQUIRE | |
| | ) PA I.D. NO: 75654 | |
| | ) | |
| | ) 218 WEST MAIN STREET | |
| | ) SUITE A | |
| | ) LIGONIER, PA 15658 | |
| | ) | |
| | ) [724] 995-8579 | |
| | ) | |
| | ) | |
| | ) | |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CRIMINAL NO: 16-cr-00017 |
| | ) | |
| ISSA BATTLE, | ) | |
| | ) | |
| DEFENDANT. | ) | |

**MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO TITLE 18 U.S.C. § 3582(c)(1)(A)(i)**

AND NOW, comes the Defendant, ISSA BATTLE, by counsel, ADAM B. COGAN, ESQUIRE, and respectfully moves this Court for an Order reducing his sentence based on the "extraordinary and compelling reasons" discussed herein pursuant to the recently amended Title 18 U.S.C. § 3582(c)(1)(A)(i) to time served and to order his immediate release from the custody of the Bureau of Prisons pursuant to Section 603 of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018) (amending Title 18 U.S.C. § 3582(c)(1)(A)(i)).

## I.    INTRODUCTION.

Issa Battle is a 38 years old African American.  He is housed at FCI Gilmer in Glenville, West Virginia.  As of the drafting of this motion, FCI Gilmer has **11 current inmates** and **5 current staff members** testing positive for COVID-19.  **One inmate has already died**.  See, Exhibit A, the BOP Press Release concerning the death of Otis Morris.  Moreover, an additional 290 inmates and 62 staff members have already contracted and recovered from the disease at an institution that has approximately 1,476

1

inmates. See, https://www.bop.gov/coronavirus/ (last visited March 9, 2021).

Overall, the BOP reports that "[t]here are **783 federal inmates** and **1,569 BOP staff** who have confirmed positive test results for COVID-19 nationwide" and that "[t]here have been **225** federal inmate deaths and **4** BOP staff member death attributed to COVID-19 disease." (emphasis in the original). See, https://www.bop.gov/coronavirus/. As such, "COVID has now killed in nine months more US prisoners than capital punishment over last 50+ years".[1]

As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Issa Battle asks this Court to find that in light of (a) the coronavirus pandemic, which public health experts and policymakers recognize is especially dangerous in the confines of crowded correctional and especially dangerous to African Americans, (b) Issa Battle's unique combination of hypertension, asthma and having once already been infected with COVID-19 place him at heightened risk of severe illness or death if he again contracts COVID-19, and (c) the Bureau of Prisons' denial of his request for a reduction in his sentence, that extraordinary and compelling reasons exist warranting his release to home confinement.

## II.    PROCEDURAL AND FACTUAL BACKGROUND.

Issa Battle was charged at a one count indictment with felon in possession of a firearm in violation of Title 18, U.S.C. § 922(g).

On May 23, 2016, Battle plead guilty to the sole charge of the indictment without

---

[1] Douglas A. Berman, Sentencing Law and Policy (December 5, 2020) reporting on the conclusions of the *UCLA Covid-19 Behind Bars Data Project* https://sentencing.typepad.com

a plea agreement.

At sentencing, Battle's base offense level was ultimately affixed at a level 31 after a 2 level reduction for acceptance of responsibility based on the determination that he was an armed career criminal pursuant to Title 18, U.S.C. § 924(e) and U.S.S.G. §4B1.4. See, Paragraphs 23-25 of the PSIR.

Battle's 16 criminal history points and his status as an armed career criminal translated into a Criminal History Category of VI.  See, Paragraph 39 of the PSIR.

With a final offense level of 31 and a criminal history category VI, Battle's Guideline Range was 188-235 months.  See, Paragraph 74 of the PSIR.

On September 28, 2016, Battle was sentenced by this Honorable Court to 188 months incarceration, a term of 5 years supervised release and a $100 special assessment. DE 83 and DE 87 at 26.

Battle has now been in federal custody February 18, 2016 a period of slightly over 5 years.

Under the 15 year, 8 month sentence this Court imposed, Battle is not scheduled to be released from BOP custody until January 29, 2029.

With respect to this Court's judgment of conviction and sentence, the Third Circuit Court of Appeals affirmed Battle's conviction on July 24, 2017.  See, United States v. Battle, No. 16-3783 (3d Cir. July 24, 2017).  Battle did not file an application for re-argument with the Third Circuit or a petition for a writ of certiorari to the United States Supreme Court.

On May 6, 2020, Battle, however, attacked the judgment of sentence and conviction through a counseled application made pursuant to Title 28, U.S.C. §2255 arguing that he was entitled to relief as a result of the United States Supreme Court's

seminal decision in *Rehaif v. United States*, 588 U.S. \_\_\_, (2019) (holding that in a prosecution under Title 18, U.S.C. § 922(g), the government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm).

On August 21, 2020, Battle's 2255 application was denied by this Court, the Court concluding that Battle's petition was untimely because:  1) although filed within 1 year of the Supreme Court's issuance of *Rehaif*, the new rule set forth in *Rehaif* did not apply retroactively to cases on collateral review; and 2) Battle could not establish his actual innocence of the offense in question in order to obtain Section 2255 relief.  See, DE 122 at 9-15.

Battle timely filed a notice of appeal from the denial of his application for federal habeas corpus relief and his request for a Certificate of Appealability remains pending before the Third Circuit.  See, *United States v. Battle*, No. 2--2726.[2]

---

[2] Despite the filing of this notice of appeal, this Court has jurisdiction to grant compassionate release to Battle.

The First Step Act confers jurisdiction on this Court so long as the exhaustion requirements of the Act have been satisfied and that jurisdiction is not lost merely because Mr. Battle has an appeal still pending.  To be sure, it is true that cases have discussed as a general matter the loss of jurisdiction in the district court when an appeal is pending.  *See, e.g., Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance," which "confers jurisdiction on the courts of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").  But it is also true that Congress may enact statutory provisions that can limit the "jurisdictional" limitation and permit the district court to act notwithstanding the filing of a notice of appeal.  For example, a sentencing court is permitted to amend a judgment and impose restitution pursuant to the Mandatory Victim Restitution Act (MVRA), Title 18 U.S.C. § 3664(d)(5), even after a notice of appeal has been filed.  This is possible because the MVRA provides that the court may hold a deferred restitution hearing and issue an amended order imposing restitution up to 90 days after a judgment has been entered.   Title 18, U.S.C. § 3664(d)(5).  The Supreme Court has held that the 90-day time limit is not jurisdictional and a sentencing court may issue an amended judgment even well after the 90-day deadline.  *Dolan v. United States*, 560 U.S. 605, 611, 613 (2010) (because the statute

Reducing Battle's sentence to time-served will do little to deprecate the impact of the original sentence either on Battle or on others who might be deterred from the conduct which formed the basis of his conviction.

Battle's case is a lesson learned hard. For his illegal possession of a firearm, Battle was indicted, convicted and watched as his sentence was left undisturbed on appeal. He has spent over 5 years behind bars in federal prison for a possessory offense in

"imposes no time limit on the victim's subsequent discovery of losses . . . a court might award restitution for those losses long after the original sentence was imposed and the 90–day time limit has expired").

More recently, the Supreme Court explained that a defendant who already filed a notice of appeal from his sentencing is required to file a second notice of appeal in order to challenge restitution imposed in an amended judgment following a deferred restitution decision. *Manrique v. United States*, 137 S. Ct. 1266 (2017). Thus, even though defendant had already filed a notice of appeal in order to challenge his sentence, the district court still had jurisdiction to amend the judgment and impose restitution. While the general rule that the filing of a notice of appeal divests the district court of jurisdiction over the case, that general principle is not always true and these cases demonstrate that if Congress wants to, it may allow the district court to retain jurisdiction in order to consider other matters in the case even after an appeal is pending.

And through the First Step Act, it has done exactly that with respect to compassionate release motions so long as defendant has exhausted his administrative remedies. Indeed, the extraordinary and compelling provision of the First Step Act is only triggered when (A) the Director of the Bureau of Prisons files a motion; or (B) the defendant files a motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility whichever is earlier." Title 18 U.S.C. § 3582(c)(1)(A). The statute provides for such release "in *any* case" in which exhaustion has been established. *Id.* § 3582(c)(1) (emphasis added). Thus, Congress expressly explained the factors upon which jurisdiction is conferred on district courts to consider compassionate release motions, and nothing in the law limits, or was intended to limit, jurisdiction merely because the inmate happens to have an appeal pending. Precluding an inmate who has a pending appeal from being granted compassionate release would defeat Congress's clear intent in enacting the First Step Act to increase the availability of such relief.

In the alternative and to the extent that this Court determines that it lacks jurisdiction to grant compassionate release, it is respectfully submitted that this Court could issue an "indicative ruling" pursuant to Fed. R. Crim. P. 37 stating whether It would grant Mr. Battle compassionate release in this case.

circumstances in which the normal pain of confinement is vastly compounded by the daily fear of expiring from a deadly virus rampant in the facility in which he is housed.

For Battle, each year is longer than 365 days.[3]

The legitimate goals of punishment of Issa Battle have been fully satisfied. Battle's further incarceration is unnecessary to the proper ends of the law and can only risk changing his sentence from a term of years to death.

### III.    ISSA BATTLE'S MEDICAL CONDITIONS.

On or about December 30, 2020, Battle began to feel sick and his worst fears were confirmed:  he had become infected with the COVID-19 virus and he was placed in isolation.   While Battle ultimately recovered from COVID-19,  the incident was particularly troubling as Battle suffers hypertension and asthma and is African American,  three well recognized COVID-19 risk factors.  Indeed, Battle's hypertension, asthma, race and his previously contracting COVID-19 place him at serious risk of death because of the Coronavirus pandemic.

Pertinent medical records obtained by the Bureau of Prisons relative to Issa Battle's treatment will be submitted to the Court under separate cover.[4]

_____

[3] In this regard, the words of Oscar Wilde have been duly noted by Issa Battle:

> "I know not whether Laws be right,
> Or whether Laws be wrong;
> All that we know who lie in gaol
> Is that the wall is strong;
> And that each day is like a year,
> A year whose days are long."

The Ballad of Reading Gaol by Oscar Wilde.  See, https://poets.org/poem/ballad-reading-gaol

[4] As the complete set of Issa Battle's medical records is moderately extensive, only the last few months of Battle's medical records (since Battle contracted COVID-19) are being supplied to the Court.  If the Court deems it necessary, however, the entirety of

Issa Battle's medical conditions mitigate against his continued incarceration especially now that the Coronavirus pandemic is upon us and especially given the life threatening situation at FCI Gilmer.

## IV.   ARGUMENT.

The First Step Act grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides in pertinent part:

> A) the court, upon . . . motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; ... ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.*

Plainly, this Court has the authority to grant Mr. Battle's petition for compassionate release after (1) finding defendant exhausted his administrative remedies, (2) finding extraordinary and compelling reasons for a reduction, and (3) considering the relevant sentencing factors under 18 U.S.C.§ 3553(a).

### A.  Issa Battle has exhausted his administrative remedies.

The First Step Act of 2018 provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative

---

Mr. Battle's medical records in counsel's possession will be supplied to the Court in a separate filing.

rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," *or* after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" *Id.*  See, *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020); see 18 U.S.C. § 3582(c)(1)(A).

In this case, Battle has satisfied the exhaustion requirement set forth in the statute. Battle submitted a request for compassionate release to the Warden of FCI Gilmer.  See, Exhibit B.  Since that time, the Warden denied his request.  See, Exhibit C.

Because Mr. Battle has applied for and been denied relief from the Bureau of Prisons, this matter is appropriately before this Court.  See, *United States v. Harris*, 812 Fed.Appx. 106, 107 (3d Cir. 2020) (holding that a prisoner may file a motion for compassionate release in the district court either after exhausting administrative remedies or after the lapse of 30 days, even if the warden denies relief within 30 days). *United States v. Raia*, 954 F.3d 594 (3d Cir. 2020); *United States v. Somerville*, No. 2:12-CR-225-NR, 2020 WL 2781585, at *6 (W.D. Pa. May 29, 2020).  *See also, e.g.*, *United States v. Williams*, 2020 WL 1974372, at *4 (D.Conn., 2020) (exhaustion satisfied where defendant requested compassionate release with the warden and request was "effectively denied" given BOP criteria making clear he was ineligible).

**B.**     **The authority to determine whether extraordinary and compelling reasons exist rests with this Court.**

The First Step Act grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." Title 18 U.S.C. § 3582(c)(1)(A)(i). Congress has never defined what constitutes "extraordinary and compelling" reasons, but the Sentencing Commission has issued a policy statement listing examples of "extraordinary and compelling reasons," as well as a "catchall"

provision if the Director of the Bureau of Prisons ("BOP") determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." U.S.S.G. § 1B1.13, cmt. n.1 (A)-(D).

Although § 3582(c)(1)(A) requires a reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission," in light of the Sentencing Commission's failure to update its policy statement to account for the First Step Act of 2018's amendments to § 3582(c)(1)(A), "the policy statement is now clearly outdated." *United States v. Rodriguez*, No. 2:03-cr-00271, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Accordingly, while "the policy statement may provide 'helpful guidance' [it] does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.*, *United States v. Brooker (Zullo)*, 976 F.3d 228, 230 (2d Cir. September 5, 2020) (concluding like the majority of the district courts that previously considered the question that "absent updated guidance from the Sentencing Commission, the First Step Act freed district courts to consider any potentially extraordinary and compelling reasons that a defendant might raise for compassionate release.").  See also, *United States v. Jones*, No. 20-3701 (6th Cir. November 20, 2020) (district courts have broad authority to determine what now qualifies as "extraordinary and compelling reasons" for a sentence reduction under the statutory provisions of Title 18, U.S.C. Section 3582(c)(1)(A)); *United States v. Gunn*, No. 20-1959 (7th Cir. November 20, 2020) (Guidelines do not limit potential "extraordinary and compelling reasons" under Title 18, U.S.C. Section 3582(c)(1)(A)); *United States v. McCoy*, No. 20-6821 (4th Cir. December 2, 2020) ("contrary to the government's argument, treating the defendants' § 924(c) sentences as an "extraordinary and compelling" reason for release is not inconsistent with any

"applicable policy statement" of the Sentencing Commission for the simple reason that the Commission has yet to issue a policy statement that applies to motions filed by defendants under the recently amended § 3582(c)(1)(A).").

Thus, this Court may make an independent determination whether extraordinary and compelling reasons justify early release in Mr. Battle's case consistent with the various courts that have already recognized that the outdated policy statements no longer limit their determination of what constitutes extraordinary and compelling and, as such, this Court clearly has the authority to independently assess whether there are "extraordinary and compelling reasons" to reduce Mr. Battle's sentence. *See United States v. Somerville*, 463 F.Supp.3d. 585 (W.D. Pa. 2020).

In evaluating Mr. Battle' request for compassionate release, this Court should similarly not give weight to the BOP's effective denial of Battle' application for compassionate release. Congress amended the compassionate release provision to "increas[e] the use and transparency of compassionate release." First Step Act of 2018, § 603(b), Pub. L. 115-391, 131 Stat. 5194, 5239 (Dec. 21, 2018). It was to make compassionate release more widely available,[5] and to address the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants," *see United States v. Redd*, No. 1:97-cr-00006, 2020 WL 1248493, *7 (E.D. Va. Mar. 16, 2020), that Congress intervened in the compassionate release process by passing the First Step Act, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *United States v. Rodriguez*, No. 2:03-cr-

---

[5] *See* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Sen. Benjamin L. Cardin, co-sponsor of First Step Act) ("The bill expands compassionate release. . . and expedites compassionate release applications.").

271, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020) (quoting *United States v. Brown*, 411 F. Supp.3d 446, 448 (S.D. Iowa) (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019))).

The First Step Act's amendment to § 3582(c)(1)(A) reflects the congressional aim to diminish the BOP's control over compassionate release by removing the BOP's exclusive "gatekeeper" role and permitting defendants to file sentence reduction motions directly with the sentencing court.[6]

This Court has all the authority it needs to decide whether extraordinary and compelling reasons warrant a sentence reduction in this case without deference to any administrative agency.  See, e.g. *United States v. Winckler*, No. 13-cr-318, 2020 WL 166652 (W.D.Pa., Apr. 3, 2020) (granting compassionate release and noting that the

---

[6] The BOP's administration of the compassionate release program has long been the subject of criticism. Although the BOP was first authorized to file compassionate release motions in 1984, it almost never did so. *United States v. Rodriguez*, No. 2:03-cr-271, 2020 WL 1627331, *2 (E.D. Pa. Apr. 1, 2020). From 1984 to 2013, an average of only 24 inmates were released each year through BOP- filed motions. *Id.* (citing *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)). The BOP's failure was multifaceted; according to a 2013 report by the Inspector General, the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id.* (quoting Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, *available at* https://oig.justice.gov/reports/2013/e1306.pdf). The same report found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id. See also United States v. Almontes*, No. 3:05-cr-58, 2020 WL 1812713, *1 (D. Conn. Apr. 9, 2020) (Underhill, C.J.) ("It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release."). Aside from the expense and inefficiency, the human costs of the BOP's stinting view of compassionate release has been documented by prisoner advocates. Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons* (Nov. 2012).

relevant authorities "do not require the Court to defer to BOP's determination or use BOP guidance to rule on Defendant's Motion," and agreeing with defendant that "what is required under the Guidelines is intentionally different than the standards applied by the BOP, and that the reasons for those differences are sound."); *United States v. Laughlin*, No. 12-cr-30081, Doc. No. 55 at *7 (C.D.Ill. Sept. 23, 2019) (Mills, J.) (opinion granting compassionate release notwithstanding prior BOP denial of reduction in sentence, and declining to give weight to BOP Program Statement 5050.50, reasoning that "[b]ecause it must consider the Sentencing Commission policy statements, the Court cannot give any weight to a Bureau of Prisons program statement that is inconsistent with those policy statements").

This Court should exercise its discretion and Section 3582(c)(1)(A) and reduce Mr. Battle's sentence.

## V.     THIS COURT MAY REDUCE ISSA BATTLE'S SENTENCE TO TIME SERVED BASED ON THE EXTRAORDINARY AND COMPELLING REASONS EVIDENT WITH RESPECT TO ISSA BATTLE.

Sadly, "extraordinary and compelling reasons" are present in Issa Battle's case such that this Court should exercise its authority and properly reduce Battle's sentence.

### A.     Issa Battle' underlying medical conditions put him at higher risk for severe illness and constitute extraordinary and compelling reasons to grant compassionate release.

According to recent analysis by the CDC, "people with chronic conditions including diabetes, lung disease and heart disease appear to be at higher risk of severe illness from COVID-19."[7] The report revealed "78% of COVID-19 patients in the U.S.

---

[7] Allison Aubrey, *Who's Sickest from COVID-19? These Conditions Tied to Increased Risk*, NPR (Mar. 31, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/31/824846243/whos-sickest-from-covid-19-these-conditions-tied-to- increased-risk ("Aubrey, *Who's Sickest from COVID-19?*").

requiring admission to the intensive care unit had at least one underlying condition. And 94% of hospitalized patients who died had an underlying condition."[8] "Among COVID-19 patients admitted to the ICU, 32% had diabetes, 29% had heart disease and 21% had chronic lung disease, which includes asthma, COPD and emphysema. In addition, 37% had other chronic conditions including hypertension or a history of cancer."[9] The BOP has reported that nearly all of the individuals who died from COVID-19 while in custody had "pre-existing medical conditions."[10]

### 1.    Hypertension.

Mr. Battle has a history of hypertension and he is prescribed a daily dose of hydrochlorothiazide to treat it.

And as a result of his hypertension, Mr. Battle is unquestionably more vulnerable to complications should he contract COVID-19.

> A large, international study of COVID-19 patients confirmed that cardiovascular disease, hypertension, diabetes, congestive heart failure, chronic kidney disease, stroke and cancer can increase a patient's risk of dying from the virus. Penn State College of Medicine researchers say their findings may help public health officials improve patient care and develop interventions that can target these high-risk populations.
>
> The researchers found that cardiovascular disease may double a patient's risk of dying from COVID-19. They also discovered that other pre-existing conditions may increase a COVID-19 patient's risk of death by one-and-a-half to three times. The results were recently published in *PLOS ONE*.
>
> "This study suggests that these chronic conditions are not just common in patients with COVID-19, but their presence is a warning sign to a higher risk of death," said Dr. Paddy Ssentongo, a doctoral student in epidemiology at the College of Medicine and research assistant professor in Penn State's Department of Engineering Science and Mechanics. "There is a high prevalence of cardiovascular disease and hypertension around the

---

[8] Aubrey, *Who's Sickest From COVID-19?*

[9] Aubrey, *Who's Sickest From COVID-19?*

[10] See Fed. Bureau of Prisons, BOP News Stories
https://www.bop.gov/resources/news_stories.jsp (last visited June 23, 2020)

world and in particular, the U.S. With the persistence of COVID-19 in the U.S., this connection becomes crucially important."[11]

Issa Battle's hypertension greatly increases his risk of catching COVID-19 again and of dying from a second round of COVID-19.

## 2.    Asthma.

Battle also has a history of asthma and he uses an albuterol inhaler as much as 4 times per day.  See, Battle's medical records.  "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19" because "COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[12]  The coronavirus "attacks the edges of the lungs" and "[w]ith asthma, anything that's foreign or unusual that enters the lungs often triggers an asthmatic response and causes the airways to narrow further and . . . become wheezy."[13]

"[C]oronavirus can cause an upper respiratory infection, which can make breathing difficult. That puts those who already have respiratory ailments, such as chronic obstructive pulmonary disease, or COPD, at a higher risk for severe and potentially life-threatening complications."[14] When COVID-19 "venture[s] deeper into

---

[11] https://www.sciencedaily.com/releases/2020/10/201008170637.htm

[12]  Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People with Moderate to Severe Asthma*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Apr. 2, 2020); *see also* David Levine, *Coronavirus and Asthma*, U.S. News & World Rep. (Mar. 27, 2020) https://health.usnews.com/conditions/articles/coronavirus-and-asthma

[13] Emmanuel Ocbazghi, *How COVID-19 Affects People with diabetes, cancer, and other conditions,* Business Insider (Apr. 2, 2020), https://www.businessinsider.com/how-covid-19-affects-conditions-diabetes-asthma-cancer- underlying-copd-2020-3.

[14] David Levine, *Coronavirus and Asthma*, US News & World Report (Mar. 27, 2020), https://health.usnews.com/conditions/articles/coronavirus-and-asthma

the lungs" the "results [are] pneumonia-like symptoms, requiring hospitalization and sometimes intubation on a ventilator. People who smoke or have chronic lung conditions are especially vulnerable."[15]

Issa Battle's asthma also greatly increases his risk of of catching COVID-19 again and this time of dying from COVID-19.

### 3.    Race.

As an African American man, Mr. Battle is 5 times more likely to be infected than his fellow white inmates.[16] When controlled for age, hospitalization rates are highest among African Americans.[17]

The CDC has made clear that that individuals in racial and ethnic minority groups who have diabetes, obesity, and asthma are at a higher risk for severe COVID-19 illness.[18]  In fact, those with asthma are 1.5 times more likely to be hospitalized due to the virus than those who do not suffer from a respiratory disease.[19]

---

[15] Joel Achenbach and William Wan, *New CDC Data Shows Danger of Coronavirus for those with diabetes, heart or lung disease, and other chronic conditions, The Washington Post (Mar. 31, 2020),* https://www.washingtonpost.com/health/new-cdc-data-on-underlying-health-conditions-in-coronavirus-patients- who-need-hospitalization-intensive-care/2020/03/31/0217f8d2-7375-11ea-85cb-8670579b863d_story.html

[16] COVID-19 in Racial and Ethnic Minority Groups, Centers for Disease Control and Prevention (Jun. 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html

[17] *Id.*

[18] *COVID-19 Associated Hospitalization Related to Underlying Medical Conditions*, Centers for Disease Control and Prevention, (Aug. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html

[19] Id.

Issa Battle's African American lineage increases his likelihood of catching COVID-19 and of dying from COVID-19.

### 4.    Battle's Previously Contracted COVID-19.

Standing alone, each of Issa Battle's aforementioned medical conditions increases the risks he faces because of COVID-19.   But Mr. Battle's risks are even more pronounced because he has already suffered a bout of infection from one of the COVID-19 virus variants and a second round of COVID-19 could prove disastrously more severe. See, e.g. *United States v. Staats*, 2020 WL 6888224, at *1 (E.D. Pa. Nov. 24, 2020) ("While Mr. Staats is asymptomatic and may fully recover from COVID-19, he is still at risk for re-infection.   Some cases of reinfection have been far more severe than the initial infection. Because Mr. Staats's underlying conditions could mean that a second infection may be more severe or even fatal, the fact he has tested positive for the virus is not a reason to deny his release.);   *United States v. Walls*, 2020 WL 6390597, at *1 (W.D. Pa. Nov. 2, 2020)("Lastly, the Court does not find that Mr. Walls's "extraordinary and compelling" situation is diminished by the fact that he has already tested positive for the COVID-19 virus while in custody. As an initial matter, there is currently no medical consensus as to whether someone who has tested positive for the COVID-19 virus—such as Mr. Walls—will be protected from reinfection. And the risk of reinfection appears to be somewhat higher for those who have tested positive for the virus but appear to be asymptomatic or minimally symptomatic, such as Mr. Walls.  In addition, the record in Mr. Walls's case does not indicate that his "recovered" status ensures that he is not currently suffering from lingering or latent effects caused by contraction of the

virus (even if unbeknownst to him at this time), or that his long-term health has not been negatively impacted. Rather, just like with Mr. Walls's risk of reinfection, those aspects remain uncertain, but have not yet been ruled out. See Quan- Xin Long, et al., Clinical & Immunological Assessment of Asymptomatic SARS-CoV-2 Infections, Nature Medicine (June 18, 2020), https://go.nature.com/3ifR85S (documenting the clinical patterns of asymptomatic infections and finding that many of the asymptomatic individuals studied developed signs of minor lung inflammation while exhibiting no other symptoms); see also Apoorva Mandavilli, Can You Get Covid- 19 Again? It's Very Unlikely, Experts Say, New York Times (July 22, 2020), https://nyti.ms/3faYwOb (stating that while "[i]t may be possible for the coronavirus to strike the same person twice," it is more likely "that some people [will] have a drawn-out course of infection, with the [COVID-19] virus taking a slow toll weeks to months after their initial exposure")).

Overall, "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." See, e.g. *United States v. Andrade, No. CR 16-20751, 2020 WL5505344 at *3 (E.D. Mich. September 11, 2020* (citing *People with Certain Medical Conditions*, CDC, https://perma.cc/7BQG-Z2R3).

Battle' hypertension, asthma, race and his previously contracting COVID-19 make him especially susceptible to catching the coronavirus  again and the disease being fatal to him and these conditions warrant this Court exercising a level of compassion to ameliorate the situation confronting Battle in light of the Coronavirus.

**B. The presence of COVID-19 within the BOP at FCI Gilmer, combined with Issa Battle's preexisting medical conditions, constitute extraordinary and compelling reasons warranting relief.**

On March 11, 2020, the World Health Organization (WHO) classified COVID- 19, a disease caused by the new strain of coronavirus, as a pandemic.[20] On March 13, 2020, the President declared the COVID-19 outbreak a national emergency.[21] As of March 9, 2021, COVID-19 has infected over 117 million people, leading to at least 2,600,000 deaths worldwide.[22] COVID-19 has also infected at least 29 million people in the United States – more than any other country – and 525,921 deaths have resulted.

As quick as COVID-19 spread across the country, it spread through the federal prison system even faster:  the rate of infection in the BOP is nearly 7 times that of the national infection rate.[23] The following charts and graphs starkly illustrate the exponential growth within the BOP:

---

[20] World Health Organization*, WHO Director-General's Opening Remarks* (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s- opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[21] White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (declaring "the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020").

[22] https://coronavirus.jhu.edu/map.html.

[23] *See* Fed. Defenders of New York Southern & Eastern Districts, *BOP COVID-19 Charts and Graphs,* https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.4.22.pdf (last visited December 2, 2020)

**Number of Reported COVID-19 Cases in Bureau of Prisons and the United States Compared by Days since First Reported Infection**





The BOP's flawed response has been widely reported. Walter Pavlo, "Federal Bureau Of Prisons Institutions Not Showing Any Signs Of 'Flattening Curve,'" Forbes, April 15, 2020.[24]

Indeed, in granting preliminary injunctive relief in a class action habeas petition for prisoners at another low security facility, FCI Elkton, the district court found the BOP's actions demonstrated deliberate indifference: "While Respondents offer certain prison-practice changes to show they know COVID-19 risks and have sought to reduce those risks, the Court still finds that, at this preliminary stage of the litigation, the Petitioners have sufficiently met the threshold for showing that Respondents have been deliberately indifferent." *Wilson v. Williams*, 2020 WL 1940882, *8 (N.D.Ohio, Apr. 23, 2020). The Court recognized that despite the BOP's efforts, officials "fight a losing battle. A losing battle for staff. A losing battle for inmates." *Id.*, 2020 WL 1940882, *1. "With the shockingly limited available testing and the inability to distance inmates, COVID-19 is going to continue to spread, not only among the inmate population, but also among the staff." *Id.*

Other courts have noted the "obvious shortcomings" in the BOP's COVID-19 Action Plan:

> First, testing inside prisons has been scant except for people who self-report symptoms—which means that statistics about the number of infections already in BOP facilities are largely meaningless. And second, the plan provides no additional protections for high-risk individuals." . . . "[E]ven in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others."

---

[24] https://www.forbes.com/sites/walterpavlo/2020/04/15/federal- bureau-of-prisons-institutions-not-showing-any-signs-of-flattening- curve/#254f0d8454dd.

*United States v. Atkinson*, 2020 WL 1904585, at *3 (D.Nev., 2020) (quoting *United States v. Esparza*, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020) (internal citations and footnotes omitted)).

A BOP OSHA complaint filed March 31, 2020 by a correctional officers' union as an "imminent danger report," suggests staff agree with the foregoing assessment of the BOP's response: "The agency's actions... are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities...."

Battle's incarceration within the BOP at FCI Gilmer compels this Court to exert a level of compassion, Battle especially susceptible to contracting and expiring from the Coronavirus at FCI Gilmer.

## C. This Court should follow those courts that have found extraordinary and compelling reasons warranting relief based on the impact of the global pandemic on vulnerable defendants in BOP custody.

Since the COVID-19 pandemic, numerous courts around the country have found extraordinary and compelling reasons warranting relief where a defendant presents evidence of a pre-existing-condition (including asthma and hypertension) making him more vulnerable to COVID-19 in combination with the increased risks of COVID-19 in prisons.   https://sentencing.typepad.com (collecting cases as of June 17, 2020); *See also, e.g., United States v. Williams*, 2020 WL 1974372, at *3-4 (D.Conn., Apr. 24, 2020) (reducing sentence to time served where defendant suffered from asthma, hypertension and diabetes, putting him at increased risk from COVID-19, and was unable to properly guard against infection while incarcerated); *United States v. Wen*, 2020 WL 1845104 (W.D.N.Y., Apr. 13, 2020) (defendant's history of asthma along with COVID-19 outbreak at his institution and that institution's failure to take basic steps to

protect against spread of this disease created extraordinary and compelling reasons justifying a reduction in his sentence); *United States v. Norris*, No. 3:18-cr-243, No. 37 (D. Conn., Apr. 16, 2020) (Underhill, C.J.) ("[Defendant] suffers from asthma and uses an Albuterol inhaler to treat his symptoms. . . . [H]is medical condition and current conditions of confinement constitute extraordinary and compelling reasons to reduce his sentence."); *United States v. Hammond*, No. 02294, 2020 WL 1891980, *9 (D.D.C. Apr. 16, 2020) (granting compassionate release to defendant with risk factors because, despite the government's assurance that the "BOP is prepared to deal with pandemics such as the coronavirus . . . 449 inmates and 280 BOP staff members have tested positive for the disease and sixteen inmates have already died"); *United States v Burrill*, No. 17-cr-491, 2020 WL 1846788, *3 (N.D. Cal. Apr. 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released); *United States v. Mahan*, 1:19-cr-223, 2020 WL 1846789, *4 (D. Id. Apr. 10, 2020) (granting compassionate release where "Defendant has a chronic, moderate asthma condition and such a condition places him at higher risk of getting very sick from COVID-19"); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851, *2 (E.D.N.Y. Apr. 10, 2020) (Ross, J.) (for defendant with hypertension, "the risk of serious illness or death that he faces in prison constitutes an extraordinary and compelling reason militating in favor of his release").

Indeed, as Judge Ranjan of the Western District of Pennsylvania recognized,

In the context of the current global pandemic, "[c]ourts around the country have granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." *Brooks, 2020 WL 2509107, at *5.* Most, though not all, of the cases where compassionate release has been granted also involved some showing that COVID-19 is actually present, usually to a significant degree, in the facility where the prisoner is incarcerated. *See,*

*e.g., United States v. Gorai, No. 18-220, 2020 WL 1975372, at \*2 (D. Nev. Apr. 24, 2020)* ("To make matters worse, defendant notes that '[o]n April 16, 2020, the count at Lompoc USP, now leading the BOP in inflicted inmates and staff, had 69 inmates and 22 staff testing positive.' ... Even those numbers may be underrepresentative because only inmates with symptoms are tested."); *United States v. Cassidy, No. 17-116, 2020 WL 2465078, at \*7 (W.D.N.Y. May 13, 2020)* ("Here, however, Cassidy demonstrates more than just a general possibility that he could contract COVID-19. ... He demonstrates incarceration in a proven 'hotbed' facility that has numerous positive cases, including inmates with whom Cassidy has shared quarters.").

At the same time, courts have most often denied motions for compassionate release where prisoners articulate only generalized or speculative fear about the risk of infection, without any showing of serious medical vulnerability or uncontrolled exposure risk in the prison where they are held. *See, e.g., United States v. Canada, No. 119-014, 2020 WL 2449344, at \*1 (S.D. Ga. May 12, 2020)* ("[W]ithout sufficient and concrete evidence to demonstrate that Canada's individual circumstances justify compassionate release because of the COVID-19 pandemic, the Court would deny Canada's motion on the merits as well."); *Brooks, 2020 WL 2509107, at \*5* ("This Court has previously stated 'the mere presence of COVID-19 in a particular prison cannot justify compassionate release-if it could, every inmate in that prison could obtain release.'"); *United States v. Gagne, No. 18-242, 2020 WL 1640152, at \*5 (D. Conn. Apr. 2, 2020)* (denying compassionate release to defendant whose underlying condition was unexplained "tingling in her right hand").

*United States v. Somerville*, No. 2:12-CR-225-NR, 2020 WL 2781585, at \*10 (W.D. Pa. May 29, 2020).

Battle' conditions coupled with his being housed at FCI Gilmer greatly increase the likelihood that he will catch the Coronavirus again and this time succumb to it.

## VII. A Sentence of Time Served Is Sufficient To Accomplish the Goals of Sentencing.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

Under all of the circumstances in this case and considering the § 3553(a) factors, this Court should conclude that the time that Mr. Battle has already served is sufficient to satisfy the purposes of sentencing.

Mr. Battle has never had a disciplinary action at FCI Gilmer, see Exhibit D, and he has learned from his mistakes and vows never to make them again.  Most importantly, he sincerely regrets the pain he has caused his family and friends and any harm he caused to others.  He is ready to make something of the time he has left.

Although Battle' crime of conviction was undeniably serious, Battle has been in custody in connection with the present offenses since February 18, 2016.

And as the BOP lists Issa Battle's current release date as January 29, 2029 after accounting for good conduct time, Battle has served the equivalent of nearly 6 years of his 15 year, 8 month sentence.

And while Battle has not yet served 50% of his sentence, numerous courts have granted compassionate release in scenarios where defendants have served less than 50% of their sentences because of the at-risk medical conditions coupled with the dire coronavirus pandemic and outbreaks in various prison/camp facilities:  *United States v. Eric Brown*, No. 13-176-1 (E.D.Pa. September 29, 2020) (granting compassionate release to organizing force behind a sophisticated mortgage fraud scheme that recruited a number of women from the defendant's past where defendant served less than 50% of his 180 month sentence and suffered from atherosclerosis, possible left ventricle hypertrophy or ischemia, asthma, sleep apnea, pre-diabetes and obesity); *United States v. Dennis Pomante*, No. 19-20316 (E.D. Mich. May 15, 2020) (granting compassionate release to 69 year old defendant who had served approximately 2 months of his 12-month custodial sentence); *United States v. Sedrick Body*, No. 18 CR 503-1 (N.D. Ill.

May 27, 2020) (granting compassionate release after 4 months served on a 42 month sentence); *United States v. Anil Prasad*, No. 19-71 (E.D. La. June 2, 2020) (granting compassionate release after 2 months served at a 24 month sentence); *United States v. Vazquez Torres*, No. 19-cr-20342-BLOOM (granting compassionate release after 4 months served on a 24 month sentence).

Having served a significant period of incarceration, Issa Battle need not be made to serve out the remainder of his original sentence in a situation that may well lead to terrible sickness and death, something this Court surely did not contemplate in originally imposing sentence.

## VII. CONCLUSION.

COVID-19 has triggered a pandemic. The virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death and Battle is housed at a location where he has already contracted the disease.  His very unique conditions make him vulnerable and constitute "extraordinary and compelling reasons" warranting compassionate release. A sentence of time served is "sufficient but not greater than necessary" to promote the purposes of sentencing.

This Court should grant this request for compassionate release.

RESPECTFULLY SUBMITTED,


s/Adam B. Cogan,
ADAM B. COGAN, ESQUIRE